[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14667
_____

D.C. Docket No. 6:08-cv-00009-WTM-GRS

MEGAN SANDS,

Plaintiff - Appellee
Cross Appellant,

versus

KAWASAKI MOTORS CORP. U.S.A.,
KAWASAKI HEAVY INDUSTRIES, LTD.,

Defendants - Appellants
Cross Appellees.

_____

Appeals from the United States District Court
for the Southern District of Georgia
_____

(March 20, 2013)

Before CARNES, HULL, and ANDERSON, Circuit Judges.

PER CURIAM:

Megan Sands brought this products liability action under maritime law after she was seriously injured when falling backwards off a Kawasaki jet ski. A jury returned a verdict in favor of Sands on her design defect claim and awarded her $3 million. The district court ultimately entered judgment in favor of Sands for $1.5 million because the jury found that she was 50% responsible for her injuries. Kawasaki then appealed, and Sands cross-appealed. After careful review and the benefit of oral argument, we affirm as to both the appeal and the cross-appeal.

I.

The accident giving rise to this appeal occurred in 2006, and it involved a Kawasaki 2003 Ultra 150 Jet Ski that was being operated by Sands' friend, Lauren Pinder, in navigable waters off the Bahamas. At the time of the accident, Sands was a 21-year-old college student. It is undisputed that right before the accident Pinder asked Sands, "Are you ready?," and Sands said "yes." Pinder then took off "at some unknown high rate of acceleration." Sands was not holding on when Pinder took off, nor was she expecting such a quick takeoff. When Sands fell backwards, the water thrust from the nozzle in the back of the jet ski tore through her vaginal and anal cavities, causing catastrophic injuries. She had to have 19 separate medical procedures and surgeries, and will likely have to wear a colostomy bag and self-catheterize for the rest of her life, absent a medical breakthrough.

2

In 2007 Sands filed a lawsuit against Kawasaki in the Southern District of Florida, asserting claims for strict liability and negligent design defect and strict liability and negligent failure to warn. The parties eventually agreed that the case should be transferred to the Southern District of Georgia, Statesboro Division because Sands was attending college in Statesboro and several of her medical care providers were there. The parties filed a joint motion to transfer the case, and it was granted.

After the case was transferred to the Southern District of Georgia, Sands filed the reports of her expert witnesses including Michael Burleson, an engineer who would testify about the design defect issue. Burleson holds a patent for a rotatable seat back that can be affixed to the back of a jet ski. According to Burleson, when rotated to the upright position, his seat back design would prevent passengers from falling backwards off a jet ski. Burleson was prepared to testify at trial that his rotatable seat back was a reasonable alternative design, and because of Kawasaki's failure to adopt that design, its jet ski was not reasonably safe. Kawasaki filed a motion in limine to exclude Burleson's testimony, arguing that his opinion was unreliable because he had not done enough testing on his proposed seat back design. The district court denied that motion in part, finding that

3

Burleson had conducted enough testing on the seat back to make his opinion reliable.[1]

In June 2010 Sands filed a motion to set a pretrial conference, which Kawasaki did not object to. By January 2011 that motion was still pending, so Sands filed a "motion for setting case for trial." In that motion, Sands stated that she wished to have her case tried as quickly as possible, and to that end "expressly agree[d] to have her case tried on all issues in Savannah, Georgia," and "expressly waive[d] her right to trial by jury to allow the matter to proceed before this Court sitting without a jury." Kawasaki responded that it did "not stipulate to a non-jury trial," but in that response it did not object to having the trial in Savannah. At the pretrial conference that followed, the judge indicated that the case would be tried in Savannah, and at that time Kawasaki stated that it had not agreed to have the trial in Savannah. The judge responded that "the case can be best tried in Savannah," but added, "If you want me to bring in a jury from Statesboro, I'll bring in a jury from Statesboro . . . ." Kawasaki never indicated that it wanted a jury from Statesboro, so the case was set for trial in Savannah, with a jury to be drawn from the Savannah Division.

---

[1] The court did grant Kawasaki's motion to exclude Burleson's testimony about other "reasonable alternative designs," such as an engine cut-off switch and fixed handles. That ruling is not at issue on appeal.

4

Kawasaki filed a pre-trial brief and, even though Lauren Pinder, the operator of the jet ski, had never been a party to this case, Kawasaki argued that the verdict form should include Pinder's name and should allocate to her an appropriate portion of the fault for the accident. The court denied Kawasaki's request, concluding that there was no authority for including on the verdict form the name of a person that the plaintiff had never sued. The court also noted that Kawasaki did not raise its argument until after the close of discovery, and it would be unfair to include Pinder's name on the verdict form when Sands had not been given the opportunity to thoroughly investigate Pinder's fault in the accident.

The case was tried before a jury in Savannah from August 1 to August 9, 2011. At that trial, Sands' design expert Michael Burleson was permitted to testify about his patented rotatable seat back, which he believed was a reasonable alternative design for the jet ski in this case. Kawasaki presented its own design expert, Robert Taylor, who testified that the jet ski would not be better off with Burleson's seat back because of the additional hazards created by it.

The jury returned a verdict in favor of Sands on the design defect claim and in favor of Kawasaki on the failure to warn claim. The jury awarded Sands $3 million for past and future medical expenses, but nothing for pain and suffering. Because the jury found that Sands was 50% responsible for her damages, the district court entered judgment in favor of Sands for $1.5 million.

5

After the verdict, Kawasaki filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, arguing that Sands failed to establish any reasonable alternative design because Burleson's testimony should have been excluded as unreliable under Daubert.  The district court denied that motion, concluding that Burleson conducted enough testing on his seat back to make his expert opinion reliable.

Kawasaki also filed a motion for a new trial, citing ten separate grounds.  Of importance to this appeal, Kawasaki contended that a new trial was warranted because the district court abused its discretion in admitting a photo of a 2010 Kawasaki jet ski with a sculpted seat back; in allowing Sands' attorney to state in closing argument that the 2010 sculpted seat "fixed" the problem of passengers falling off the back; in transferring the case to Savannah for trial; in prohibiting evidence of Sands' medical insurance after she opened the door to that issue; and in refusing to include Lauren Pinder's name on the verdict form so that the jury could assess her percentage of fault.  Kawasaki also asked the court to alter or amend the judgment to conform to the evidence of special damages under Federal Rule of Civil Procedure 59(e).  The court denied Kawasaki's motion for a new trial in its entirety.

Sands filed her own motion for a new trial on the issue of damages only, contending that the verdict was inadequate as a matter of law because the jury had

found liability and awarded $3 million in past and future medical expenses, but had awarded nothing for pain and suffering. The district court denied that motion, concluding that Sands' argument was foreclosed by this Court's decision in Coralluzzo v. Education Management Corp., 86 F.3d 185, 186 (11th Cir. 1996).

Kawasaki appealed, contending that the district court erred or abused its discretion at various points during and after the trial, and Sands cross-appealed, contending that the district court abused its discretion in refusing to grant a new trial on the issue of damages only.

II.

Kawasaki first contends that the district court failed in its gatekeeping function under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993), when it allowed Sands' expert, Michael Burleson, to present his seat back as a reasonable alternative design. Federal Rule of Evidence 702, which controls the admission of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Supreme Court has made clear, that rule "compels the district courts to perform the critical 'gatekeeping' function concerning the

7

admissibility" of expert scientific and technical evidence. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). The proponent of expert testimony always bears the burden of proving its admissibility. Id.

In determining the admissibility of expert testimony under Rule 702, district courts must consider, among other things, whether "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert . . . ." Id. And one of the factors used to evaluate the reliability of an expert opinion is whether it can be and has been tested. Id. at 1262. District courts enjoy "considerable leeway" in making reliability determinations, and "we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Id. at 1258–59.

Kawasaki argues that Burleson's expert testimony should have been excluded as unreliable because he did not do enough testing on his proposed alternative design. In denying Kawasaki's Daubert motion, the district court found that Burleson's "opinions were adequately tested to meet the reliability prong of Rule 702." In support of that finding, the court referred to Burleson's report, which stated that he had tested his seat back design on the Kawasaki jet ski at issue in this case and on other personal watercraft, and that his testing consisted of "acceleration and operational testing with a passenger in place." The court also referred to Burleson's deposition, where he testified that he had tested his seat back

8

"in a real world situation" for "several hours over a period of time." Based on his in-water testing of the seat back and the principles of physics and mathematics, Burleson concluded in his report that his seat back could provide "both comfort and safety without sacrificing utility of the product or creating dangerous hazards."

Kawasaki argues that Burleson's testing wasn't sufficient because he did not do "any testing to determine whether his seatback would add new safety hazards." It is difficult to prove a negative, but based on his testing of the seat back, Burleson concluded that it would prevent people from falling off the back of the jet ski without "creating dangerous hazards." He was not required to test his seat back under every conceivable condition in order to rule out the possibility of additional safety hazards. To the extent that Kawasaki believed that Burleson's proposed design created new hazards of a greater magnitude than those prevented, it was free to — and did — cross-examine Burleson about that. Kawasaki was also free to — and did — present its own expert to testify that Burleson's design did not increase the overall safety of the jet ski because it created new safety hazards. We cannot say that the district court abused its discretion by denying Kawasaki's motion to exclude Burleson's testimony on the grounds that it was unreliable.

Kawasaki also contends that the district court "exacerbated its error" by precluding it from introducing Exhibit 72, which was created by its design expert,

9

Robert Taylor, using Mathematical Dynamic Modeling (MADYMO).[2]  Exhibit 72 would have depicted some of the foreseeable consequences that might be caused by Burleson's seat back design, and Kawasaki tried to introduce it during Taylor's testimony.  In refusing to admit the exhibit, the court reasoned that "because the witness did not perform any tests on the Burleson seat back, and the exhibit shows an operator and not a passenger . . . the probative value in assisting the jury to evaluate the expert's opinion is substantially outweighed by the exhibit's potential for prejudice . . . ."

Kawasaki argues that Exhibit 72 was "highly relevant" because it showed how Burleson's design would have introduced "other dangers of equal or greater magnitude."  Kawasaki also argues that it does not matter that the modeling showed an operator and not a passenger because it was not intended to be an accident recreation.  Even if Kawasaki is correct, it still has not shown how it suffered substantial prejudice from the district court's refusal to admit Exhibit 72. See Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1259 (11th Cir. 2004) ("We review evidentiary rulings made by the district court for abuse of discretion and will reverse the district court's decision only in cases where substantial prejudice exists.").

---

[2] MADYMO is scientific mathematical model that is used to show the effect of force on the human body during watercraft motions or ejections.  In simpler terms, it is "an analytical crash test dummy."

10

Kawasaki's expert, Taylor, indicated in his testimony that he used MADYMO "to evaluate some potential effects of Mr. Burleson's proposed seat back." He was also asked whether, based on his testing, he thought Burleson's seat back was a "safer alternative design," and he responded that the jet ski "would not be better off — that it would not be a better design to have that kind of seat back on the [jet ski]." Taylor was then asked to "describe for the jury" his "reasons for coming to that conclusion," and he answered as follows:

> Some of the reasons are associated with what I would call the unintended ill consequences of design change, in that this design proposed by Mr. Burleson, one, I don't believe it will work. Two, the aspect of riding a [jet ski] is very aggressive, and it's a rider-active vehicle, and if you hold on you can stay on the craft. But we know that from other instances—people doing wave jumping—there are times when people are posting up and down to absorb wave jumping, and in those instances I've evaluated loads on the spine associated with contact with seat and structures on the [jet ski]. And to the extent that you would have another fixed structure in this region where people could strike it while doing other aggressive activities, strike it in the neck, the head, the spine, I think those will be injury producing.

According to Taylor, Exhibit 72 would have "depicted some of those . . . foreseeable consequences" that he had described. So according to Taylor's testimony, Exhibit 72 was merely an illustration of the types of consequences he described to the jury. Because Exhibit 72 was just an illustration of consequences that the jury had already heard about, Kawasaki suffered no substantial prejudice from the district court's refusal to admit it.

11

Kawasaki next contends that the district court abused its discretion in allowing Sands to introduce during its cross-examination of Taylor a photo of a 2010 Kawasaki jet ski with a "sculpted" seat back. Taylor testified on cross-examination that in 2003 "it was not feasible from an overall engineering design standpoint" to build a jet ski with a raised seat back such as the one designed by Burleson. The court then allowed Sands to introduce the photo of the 2010 Kawasaki jet ski with the sculpted seat back for the limited purpose of asking Taylor "whether or not he still has an opinion that it would not be feasible to build it . . . ." Taylor's response was that the sculpted seat in the picture and the Burleson seat back were "two different things," because the sculpted seat had a low height and was not a safety feature, while the Burleson design was a "10- or 12- inch impediment on the back" of the jet ski. Taylor maintained that from an engineering standpoint Burleson's "tall seat" would not be feasible to build.

Kawasaki argues that the photo should not have been admitted because the sculpted seat on its 2010 jet ski was nothing more than a "comfort feature," and that "[n]o one tested it to see if it would have made any difference here." But even if Kawasaki is correct, it again has not shown substantial prejudice because Taylor explained to the jury how the sculpted seat was different from the taller seat back proposed by Burleson. Taylor also made clear to the jury that the sculpted seat back was not a remedial measure by stating, "If you're asking me is this a safety

12

benefit to have a sculpted seat, and would it have prevented this particular event, the answer is no."

The photo of the sculpted seat on the 2010 Kawasaki jet ski reappeared later in the trial during the closing argument of Sands' attorney. Specifically, Sands' counsel referred to the sculpted seat by saying that it "fixed" the problem. According to Kawasaki, that argument was improper because it suggested to the jury that the new seat design was an admission that the earlier design was defective.

"A district court has wide discretion to regulate the scope of argument." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1282 (11th Cir. 2008). "For reversible error to be found in a closing argument, the challenged argument must be 'plainly unwarranted and clearly injurious.'" Id. In this case the district court recognized that the reference to the 2010 seat design was improper, and gave the following curative instruction to the jury: "In considering the evidence and making your decision in this case, you should disregard any comments that [Sands' counsel] made in his closing argument regarding a 2010 Kawasaki personal watercraft because that argument was improper."

"We presume that juries follow the instructions given to them." United States v. Lopez, 649 F.3d 1222, 1237 (11th Cir. 2011). Because the district court gave a curative instruction, and because we presume the jury followed that

13

instruction, the statements made by Sands' counsel in his closing argument were not "clearly injurious." See Lanham v. Whitfield, 805 F.2d 970, 972 (11th Cir. 1986) (holding that the district court did not abuse its discretion in denying a motion for a new trial based on an alleged improper statement in closing argument because the court had given curative instructions to disregard that statement).[3]

Kawasaki also contends that the district court abused its discretion in prohibiting it from introducing evidence of Sands' medical insurance. Kawasaki asserts that Sands "opened the door" to the issue of insurance through her therapist, Katie McGrory, who testified that Sands had told her that she felt guilty about being a financial burden on her parents and that her father had to work more to cover her medical expenses. She also testified that Sands received counseling at a discounted rate because she was a student. Kawasaki also points to McGrory's testimony on cross-examination, where she was asked whether she thought it would have been helpful to obtain the records from a professional that Sands had seen before the accident so that she could decide whether Sands had suffered from generalized anxiety disorder before the accident. McGrory responded that it might have been helpful, but she was not in a hurry to give Sands a diagnosis because

---

[3] Kawasaki argues that the suggestion that the 2010 sculpted seat back "fixed" the problem was so damaging that a curative instruction could not fix it. We disagree. Kawasaki has cited no authority, and we have found none, to suggest that the statement was so damaging that it could not be corrected with a curative instruction, especially in light of Taylor's testimony explaining to the jury that the sculpted seat on the 2010 design was merely a comfort feature and not a safety feature.

14

Sands was paying "out of pocket," and so she didn't need to "come up with a code to give the insurance company."

When Kawasaki argued that Sands had opened the door to the issue of medical insurance, the district court ruled that she had not, reasoning that McGrory's response on cross-examination was just an explanation of why she had not sought to obtain records from another physician and that the reference to insurance "passed over the heads of this jury and would have no effect on this case." As such, the court found that the prejudice of introducing evidence of insurance coverage would "far outweigh any probative value." That ruling was not an abuse of discretion. McGrory did not imply that Sands did not have medical insurance. Instead, she merely stated — truthfully — that Sands paid out of pocket for her services, and that Sands had expressed guilt over being a burden to her family. Jurors are no doubt aware that medical insurance does not cover every possible expense, and the district court recognized that when it noted that McGrory's tangential reference to insurance "would have no effect on this case."

Kawasaki further contends that the district court misapplied maritime law by not including the name of Lauren Pinder, the operator of the jet ski, on the verdict form so that the jury could assess her percentage of fault for the accident. The general rule in maritime law is that a plaintiff may sue any defendant "for the full amount of damages for an indivisible injury that the [defendant's] negligence was

15

a substantial factor in causing, even if the concurrent negligence of others contributed to the incident." Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260, 99 S.Ct. 2753, 2756 (1979). Under that rule, Sands was permitted to sue Kawasaki for the full amount of her damages, even though Pinder's negligence might have contributed to her injuries.

Kawasaki relies on McDermott, Inc. v. AmClyde, 511 U.S. 202, 114 S.Ct. 1461 (1994) to argue that Pinder's name nonetheless should have been included on the verdict form. McDermott "settled decades of debate over the proper method of apportioning liability between settling and nonsettling tortfeasors in admiralty cases by holding that the proportionate share approach applies." Murphy v. Fla. Keys Elec. Co-op, 329 F.3d 1311, 1314 (11th Cir. 2003) (quotation marks omitted). Under that approach, if at least one defendant does not settle with the plaintiff, the amount of damages and percentage of liability attributable to each defendant is determined at trial. McDermott, 511 U.S. at 208–13, 114 S.Ct. at 1465–67. However, the Supreme Court made clear in McDermott that the proportionate share approach applies only when there has been a settlement, and that McDermott did not abrogate the "well-established principle of joint and several liability" as stated in Edmonds. McDermott, 511 U.S. at 220–21, 114 S.Ct. at 1471. Accordingly, the general rule of Edmonds applies in this case, Sands was permitted to sue Kawasaki for the full amount of her damages, and the court did

16

not err in refusing to include Pinder on the verdict form, even though she might have contributed to Sands' injuries.

Kawasaki also contends that the district court abused its discretion in refusing to further reduce the jury's $3 million award for past and future medical expenses. "In general, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." Goldstein v. Manhattan Indus., Inc., 758 F.2d 1435, 1448 (11th Cir. 1985); see also Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1284 (11th Cir. 2000) ("The rule in this circuit states that where a jury's determination of liability was not the product of undue passion or prejudice, we can order a remittitur to the maximum award the evidence can support.").[4]

The parties stipulated that Sands incurred $228,815.09 in past medical expenses. Sands also presented evidence about her future medical expenses through the testimony of Rosemary Baltayan, who testified about a "life care plan" that she had prepared for Sands, which includes "anything that's necessary from a medical standpoint" that Sands would need for the rest of her life. The amount of future medical expenses calculated in the life care plan, reduced to present value, was $1,211,567.41. Kawasaki argues that the sum of the past medical expenses

---

[4] The Seventh Amendment does require that a plaintiff be given the option of a new trial in lieu of remitting a portion of the jury's award. Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1329 (11th Cir. 1999). Because the verdict here does not exceed the amount established by the evidence, we do not reach that issue.

17

and Baltayan's estimated future medical expenses (about $1.44 million) is the maximum amount of damages supported by the evidence, and therefore the jury's verdict of $3 million is clearly excessive. Kawasaki is wrong.

First, as the district court noted in denying Kawasaki's motion to amend the judgment, "the number presented by the life care planner was simply an estimate, from which the jury is permitted to draw its own conclusion about [Sands'] future medical costs. . . . [I]t is unsurprising that the jury might increase the amount for future medical costs given the quantity and breadth of [Sands'] future needs, combined with the lifetime nature of her injuries." In fact, Baltayan testified that in preparing her estimates for future care, she did not account for potential medical complications. Specifically, she testified that

> The only thing that's left out [of the life care plan] is complications, which we often write as possibles. I didn't do that here. Those are things that are not factored in by the economists, but you certainly need to be aware, she could develop hernias, she may need to have the ostomies redone, she may have to go to in-dwelling catheters. She may at some point, you know — I doubt she's going to have the artificial sphincter done but, you know, if it becomes more prevalent . . . then those are things that would possibly make [the future medical expenses] more.

And there was plenty of other evidence in the record to suggest that Sands may have complications. Sands' treating physician, Dr. Timothy Thaller, testified that in the four years he has treated Sands, she has tested positive 10 times for potential urinary tract infections. He also testified that she is at a "much higher"

18

risk for recurrent urinary tract infections because she has to self-catheterize.  He further testified that because Sands must take daily antibiotics to prevent recurrent infections, she is at a greater risk for developing strains of bacteria that are drug-resistant and can only be treated through hospitalization.  Dr. Guillermo Davila also testified that there may be medical advances in the future that could improve Sands' otherwise permanent condition.  All of that testimony shows that there is a lot of uncertainty about Sands' future medical needs, which might require her to incur more expenses than those included in the life care plan.

Second, as the district court also noted, "the life care planner's amount [was] reduced to present market value.  The jury was instructed that they were not bound by the economist's opinion as to the present market value of future medical costs, but may rely upon it as an aid when calculating an award of damages. Therefore, the jury is permitted to either increase or decrease an award for future damages based on their informed belief as to the proper present market value."  For all of those reasons, the district court did not abuse its discretion in refusing to remit the jury's damages award because that award was supported by the evidence.[5]

---

[5] Kawasaki also contends that the district court abused its discretion when it decided that the case should be tried in the Savannah courthouse instead of the one in Statesboro.  We disagree.  The local rules for the Southern District of Georgia provide that "[b]y Order of the Court, any civil action may be transferred for trial to any other place or division within the district."  S.D. Ga. L.R. 2.3.  Moreover, the district judge gave Kawasaki the opportunity to ask for a jury drawn from the Statesboro division, and it did not do so. There was no reversible error.

19

III.

In her cross-appeal, Sands contends that the district court abused its discretion by not granting her motion for a new trial on damages only under Federal Rule of Civil Procedure 59.  She asserts that the jury's award of $0 for pain and suffering was legally inadequate and against the "manifest weight" of the evidence.  Sands' argument, however, is foreclosed by our decision in Coralluzzo v. Education Management Corp., 86 F.3d 185 (11th Cir. 1996).  In Coralluzzo, the plaintiff sued a marine theme park after he was bitten by one of the park's animals.  Id. at 185.  The jury, by special verdict, awarded past medical and hospital expenses of $15,000 and punitive damages of $5,000.  Id. at 186.  The jury wrote "0" in the space on the verdict form for the amount of damages for the plaintiff's pain and suffering.  Id.  The plaintiff appealed the denial of his motion for a new trial based on the jury's failure to award damages for "indisputable" pain and suffering.  Id.  We affirmed on the ground that the plaintiff failed to object to the inconsistency of the jury verdict before the jury was discharged.[6]  Id.

---

[6] In Coralluzzo, we reasoned that "[t]his court has repeatedly held that all challenges to the inconsistency of special verdicts must be raised before the jury is excused."  86 F.3d at 186. That statement has been called into question by Mason v. Ford Motor Co., 307 F.3d 1271, 1274 n.4 (11th Cir. 2002), which recognized that "[s]ome conflict seems to exist on whether the failure to object to inconsistent special verdicts before the jury is excused constitutes a waiver of the right to seek a new trial . . . ."  Mason noted that some decisions from the former Fifth Circuit had concluded that it was error to enter judgment on inconsistent answers to special verdict questions even without a timely motion before the trial court, while other cases such as

20

Like the plaintiff in <u>Coralluzzo</u>, Sands did not object to the jury verdict as inconsistent before the jury was excused. Also like the plaintiff in <u>Coralluzzo</u>, she is arguing that the jury, having found that Kawasaki was liable, could not possibly have concluded that she was not entitled to damages for pain and suffering. Sands insists on appeal that she is not challenging the verdict as inconsistent, and that she instead is arguing that the verdict was against the "manifest weight" of the evidence. The problem with Sands' argument is that there was evidence to support the jury's decision not to award pain and suffering: Kawasaki presented a great deal of evidence suggesting that it was not liable for Sands' injuries at all. If the jury had credited that evidence over Sands' evidence, then Sands would not have been entitled to any damages, including damages for pain and suffering. But the jury did not credit Kawasaki's evidence, which is exactly Sands' point: there was no way that the jury could have found liability and yet award no damages for pain and suffering, given the overwhelming evidence of that pain and suffering. All of which means that Sands is challenging the jury's verdict as inconsistent, and that challenge is barred on appeal because she did not object to the verdict before the jury was excused. See <u>Coralluzzo</u>, 86 F.3d at 186.

---

<u>Coralluzzo</u> seemed to conclude the opposite. <u>Id.</u> That conflict does not matter here because this case involves a general verdict, and there is no question that the failure to object to inconsistencies in a general verdict before the jury is excused waives the right to bring that challenge later. <u>Id.</u>

21

Sands attempts to distinguish <u>Coralluzzo</u> by arguing that it involved a special verdict under Federal Rule of Civil Procedure 49(a), while this case involves a general verdict under Federal Rule of Civil Procedure 49(b).  That distinction does not help Sands because as we have noted, "if the jury rendered inconsistent general verdicts, failure to object timely waives that inconsistency as a basis for seeking retrial."  <u>Mason v. Ford Motor Co.</u>, 307 F.3d 1271, 1274 (11th Cir. 2002).  Because Sands did not object to the verdict before the jury was dismissed, she cannot now challenge that verdict as inconsistent.

**AFFIRMED.**