**Ernest A. "Andy" WEBB, Plaintiff**

v.

**ENSCO MARINE COMPANY and Defendant/Third–Party Plaintiff**

v.

**Martin Terminal, Inc. Defendant/Third–Party Defendant**

**No. C.A. 1:99 CV 0159.**

United States District Court, E.D. Texas, Beaumont Division.

Feb. 6, 2001.

---

**14.** The parties have not disputed that Goines (and the other defendants) acted under color of state law.

Richard M. Schechter, Houston, TX, for Plaintiff.

Robert L. Klawetter, Houston, TX, for Defendant Ensco.

Innes Mackillop, White Mackillop & Baham, Houston, for Martin Terminal.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

COBB, District Judge.

1. This is a maritime personal injury suit. Plaintiff Ernest Webb ("Webb") was injured on June 4, 1998, while working as Captain for Ensco Marine Company ("Ensco") onboard the *ENSCO NAVIGATOR*. At the time of the injury the *NAVIGATOR* was in navigable waters in the Gulf of Mexico, tied off to an unmanned platform. Webb was injured when a piece of the oilfield casing that had been loaded and secured on the back deck by Defendant Martin Terminal, Inc. ("Martin") came loose and began rolling back and forth. In an effort to stop the pipe from rolling, Webb and two other members of the crew lifted a heavy piece of nylon rope to drape over the pipe. In that lifting process Webb injured his neck and low back.

2. Webb brought this suit against Ensco and Martin. Ensco filed a third-party action against Martin, seeking reimbursement for the maintenance and cure benefits it paid to, or behalf of, Webb. Prior to trial Webb and Ensco settled, leaving for resolution by trial Ensco and Webb's claims against Martin.

3. This case was tried to the Court October 18–20, 2000. In addition to live testimony, the Court also received numerous exhibits and several depositions, which the Court has since read and reviewed. The Court also left the record open for supplementation and has reviewed all additional materials submitted. Objections were filed to some of the additional evidence and portions of the depositions. The Court rules that all Martin's objections are sustained and Webb's objections are overruled. The Court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

4. The *ENSCO NAVIGATOR*, a 180 foot supply vessel, is used for transporting cargo to and from offshore platforms and drilling rigs in the Gulf of Mexico. At all relevant times Ensco owned the *ENSCO NAVIGATOR*, Webb was the boat's Captain, Steve Spurlock its First Mate, and all the crew members, including Webb and Spurlock, Ensco employees.

5. In June 1998 the *NAVIGATOR* was under time charter to Sonat Exploration Company ("Sonat") and was servicing a drilling rig, the Falcon 18.

6. On June 2, 1998, the *NAVIGATOR* pulled into Martin's marine terminal located in Fourchon, Louisiana, to pick up cargo destined for the Falcon 18. Martin operates the dock facility there, and its employees load and unload numerous offshore supply vessels on a daily basis, around the clock. Martin employees were to load and secure the cargo on the *NAVIGATOR* pursuant to a service contract between Martin and Sonat.

7. On June 2 or 3, 1998, Martin employees loaded and secured various pieces of cargo onto the back deck of the *ENSCO NAVIGATOR*. This cargo included five large pieces of oilfield casing. Each was made of steel and was approximately 25 feet long, two inches thick, five feet in outer diameter and weighed approximately 15 tons. Each piece of casing had two padeyes welded to it, one on each end.

8. The actual loading and securing of all the cargo onto the *ENSCO NAVIGATOR*, including the casing, was handled by Martin employees. None of the Ensco employees were involved.

9. Although they were not involved in the loading and securing process, Ensco employees did monitor the loading of cargo onto the back deck of the *NAVIGATOR*. Webb, the vessel's captain, delegated that responsibility to his chief mate, Steve Spurlock, and the Court finds that Spurlock did indeed do as he was ordered. Webb instructed Spurlock where to have Martin place the large pieces of casing, and they were ultimately properly located by the Martin employees, but while the cargo was loaded and secured Webb was off duty. While he observed where the casing was loaded prior to the vessel's departure, Webb never personally observed how it was secured.

10. The *ENSCO NAVIGATOR* sailed from the Martin docks fully loaded to West Delta Block 39, where Falcon 18 was located. The vessel arrived at the rig around 10:15 a.m on June 3rd. When the *ENSCO NAVIGATOR* arrived at Falcon 18, Webb and the Falcon crane operator located on the rig worked together to coordinate the unloading operations, although Falcon Rig 18 controlled the order in which cargo was

offloaded. Two roustabouts from Falcon Rig 18 were lowered onto the deck of the *NAVIGATOR* to handle the offloading chores on the vessel. Ensco employees were not involved in the offloading of the cargo.

11. When the *NAVIGATOR* first arrived at Falcon 18, Webb suggested that the five large pieces of oilfield casing be offloaded first. The crane operator informed Webb that they did not have room for the casing on the rig at that time, and so the casing had to remain on the vessel. The Court finds that this is not unusual and that it is foreseeable to all involved in the offshore industry that a supply boat might go several days before its cargo is fully offloaded. That is why it is so important that all cargo is properly loaded and secured when it leaves the dock.

12. After the two roustabouts were lowered from Falcon 18, but before offloading began, Webb met with them. He instructed them to prepare only the cargo immediately to be lifted off the vessel and not to touch the chains or bindings for any other cargo.

13. Unloading operations began after 10:15 a.m. of June 3, 1998, and continued about four hours. The two roustabouts worked on the back deck of the vessel and Webb was able to follow their activities from the wheelhouse most of the time. While the unloading was taking place the weather began to deteriorate. The Court finds this is not an unusual development in the Gulf of Mexico. Eventually the seas became so rough that neither Webb nor the crane operator felt offloading operations could continue in a safe fashion. The roustabouts were lifted back onto Falcon Rig 18 and Webb was instructed to take his vessel to a nearby position and standby for further instructions. The *NAVIGATOR* left the rig at approximately 2:30 p.m. on June 3, 1998, and moved to a standby position, tied off to an unmanned platform, a few miles from the Falcon 18.

14. Over the next 18 hours the *NAVIGATOR* made three runs back to Falcon 18 to see if the seas were calm enough to continue unloading. On one occasion they were able to offload small cargo for about 15 to 30 minutes. At no time before Webb's injury, however, were any of the five pieces of large oilfield casing offloaded. The vessel returned to its standby location from its third trip at 5:30 a.m. on June 4, 1998.

15. At about 9:00 a.m. Webb was awakened by the sound and vibration caused by one of the large pieces of oilfield casing rolling back and forth on the deck of the vessel. Webb immediately dressed and went to the back deck to investigate. He found the piece next to the end piece on the starboard side rolling back and forth, approximately a foot to a foot and one-half each way. Webb and the two members of the crew who joined him on the back deck, Chief Engineer Robert Marble and Lead Able-bodied seaman Ricky Davis, saw that the two binders used to secure the casing had both broken open. Additionally, the chain run through the padeyes on the casing was run directly through the padeye on the fourth piece of casing, and not looped around the padeye and run back through a second time. Webb, Marble and Davis felt that the rolling casing constituted a dangerous situation, a conclusion with which the Court agrees, and feared that the casing, if it continued to roll, would cause serious damage to the vessel. The Court finds that this was an emergency situation demanding immediate corrective action. The men unsuccessfully tried various methods of securing or cribbing the casing. Finally, Webb decided they should pick up a large piece of rope that was used as a fender for the vessel, carry the rope back to the moving casing, and throw it

over the casing to cushion the casing. The three men knelt beside this long piece of rope, lifted it up to their shoulders using proper lifting techniques, and carried it back to throw over the casing. The placement of this rope over the casing successfully cushioned the impact of the casing as it rolled. In the process of lifting the rope and placing it on his shoulder, however, the Court finds that Webb was injured.

16. The Court finds that this condition that Webb was trying to cure, the loose and rolling piece of casing, was a dangerous condition that arose because the casing had not been properly secured. The casing was secured by two chains. One ran through the padeye on the forward end of the casing and was secured to a padeye located on the port and starboard sides of the back deck. The second ran in a similar fashion through the padeye located on the aft end of the casing, and was also secured to a padeye on the deck. The chains were run directly through the padeye of the loose casing and not wrapped around and looped through a second time. Binders were then used to bring the chains taut and the binder handles were closed. It was these binder handles that broke open on the morning of June 4th, allowing the casing to roll. Although this issue was in dispute, I find, based on the credible and believable testimony, that the Martin employees did not secure the binders handles closed with chain, rope, duct tape, wire or other securing device.

17. Webb, Robert Marble and Ricky Davis testified that the binders were not positively secured in the closed position when they went to inspect at 9:00 a.m. on June 4, 1998, and there was no sign that the binder handles had been wrapped by any securing device such as chain, rope, duct tape, or wire. I find this testimony and evidence to be credible. Webb further testified that the way the Martin employees had run the chains through all the padeyes on the casing and hooked the chains back on themselves outside the headache rack had not left enough slack in the chains near the binders so that the chains could have been wrapped around the binder handles to positively secure them closed. I also find this testimony to be credible.

18. Although it offered no direct testimony that its employees secured the binder handles closed, Martin seemed to suggest it was possible that its employees had secured the binder handles shut and that the securing mechanisms had been removed by the roustabouts from the Falcon 18 during the two unloading operations on June 3 and 4, 1998. The Court finds that the Falcon 18 roustabouts did not in any way alter the manner in which the five pieces of casing had been secured by Martin employees at the Fourchon terminal. This finding is supported by the testimony of the Plaintiff, who the Court found to be the most credible witness on the liability issues. Webb watched the roustabouts during most of the unloading operations. He never saw them go in the area where the binders for the casings were located or unwrap the binders. Had the roustabouts unwrapped and broken open the binders when Webb was not watching, Webb would later have seen the chains over the casing go slack. Webb testified he observed that the chains remained taut throughout the whole unloading operations. Webb testified that he spoke with the roustabouts prior to unloading operations and told them not to tamper with or break open any securing devices, such as binders, unless they were ready to remove the cargo. That had been understood by all and there is no indication that the rig was ever in a position to start removing the casing from the vessel. There was no reason for the roustabouts to have unwrapped the binders. The Court finds that roustabouts

from Falcon Rig 18 did not alter the manner of securing the five large oilfield casings.

19. The Court finds that the unsecured condition of the binder handles on June 4th reflected their condition when the vessel left Fourchon and that the handles had not been secured shut by the Martin employees after they loaded the five pieces of large oilfield casing on the back of the *ENSCO NAVIGATOR.*

20. The Court also finds that the chains over the casing were run straight through the padeyes of the casing that came loose, not through the padeyes, looped back around, and run back through a second time. There is no evidence that anyone altered the manner in which the chains were run through the padeyes on the big pieces of casing from the time they were secured by Martin's employees until the casing began rolling at approximately 9:00 a.m. on June 4, 1998.

21. The Court finds that Martin and its employees, acting in the course and scope of their employment, were negligent in several respects. First, the Court finds they were negligent in failing to secure the handles of the binders shut by wrapping them with some type of securing device, such as chain, rope, wire or duct tape. The Court finds the testimony of Webb and certain documentary evidence introduced by Plaintiff to be much more credible and believable than any testimony that Martin was not negligent. Webb testified that, in his opinion, based on his 14 years at sea, standard of care required the binder handles be secured closed. He testified he had never seen a marine terminal secure oilfield casing without wrapping the binder handles closed to make sure the handles did not come open. The Court found this testimony to be very credible, especially given the candor, fairness and intelligence of the witness. Additionally,

Plaintiff offered into evidence two crane and rigging handbooks addressing how to use load binders. One states the handle should be secured closed "by wrapping it with the load chain or a piece of wire." The other directs users to wrap "the loose end of the chain around the handle and the chain tight or tie handle to chain with soft wire." Plaintiff also introduced into evidence instructions from a seller of binders about how to use them. Those instructions match the instructions quoted above. Webb also read into evidence the manufacturer's operating instructions regarding use of binders similar to the ones being used on the vessel at the time of his injury. These instructions specifically state that one should secure [the binder] handle down with a positive retaining method.

22. The Court also finds that the Martin employees were negligent in the way in which they hooked the binders back into the chain. In doing so they failed to leave slack in the chain so that the chain could be wrapped around the binder handle to secure the handle shut.

23. Martin offered testimony that the exercise of reasonable care did not require its employees to wrap the binder handles closed. One piece of testimony came from Martin's expert, Donald Green. On cross-examination, however, Green admitted Martin should follow the safety instructions issued by the manufacturer and rigging experts, and that he thought the better and safer practice was to secure the handles shut. To the extent that Joey Bouziga and Stephen Chapman testified that the exercise of reasonable care did not require the binder handles to be secured shut, the Court finds that testimony not to be credible, especially given the evidence to the contrary.

24. The Court also finds that reasonable care required the Martin employees

to run the securing chains through each padeye, loop them back around the padeye, and run them through a second time. Webb testified this was the proper method of securing the cargo because it put a bit on the pipe and prevented it from rolling. The Court finds Webb's testimony on this issue to be most credible. The Court finds that Martin's employees were negligent in failing to properly run the securing chain through the padeyes on the piece of casing that came loose by looping them around each padeye, and then running the chain back through a second time.

■ 25. The Court also finds that Martin was negligent for its failure to adequately train its employees in the proper method of securing cargo. Martin's manager, Joey Bouziga, admitted that Martin had no formal training program and that the only training its employees received was on-the-job training. He admitted there was no testing or evaluation of employees to determine whether they had adequately mastered the skills of properly loading and securing cargo. Martin's safety manual was only 11 pages long and failed to addressed the proper methods or fundamental principles of securing cargo on the deck of a vessel. Mr. Bouziga testified in response to a direct question from this Court at the end of his examination, "after its on the boat, it's not our responsibility any more." The Court finds this reflected a lax attitude that appeared to be characteristic of Martin's lack of concern for safety and training. Mr. Bouziga claimed there were safety meetings that discussed the topics of properly securing cargo on decks of a vessel, but Martin never offered documentation to substantiate this claim.

26. Martin never even identified the employees who participated in loading and securing cargo onto the *ENSCO NAVI-GATOR*. As a consequence, evidence uniquely in control of Martin, specifically, the identity, qualifications and training of the men who loaded and secured the cargo on the *NAVIGATOR* was not presented to the Court. The Martin employees who participated in the loading and securing process were supposed to be certified riggers who had undergone specialized training. Martin did not produce any documentation, however, to prove that the employees who participated in loading the *ENSCO NAVIGATOR*, or even those who were simply on duty during that time, were certified riggers, although Martin's operations manager, Joey Bouziga, testified such information if it existed, should be in Martin's possession. Given that this information was uniquely in Martin's possession in Louisiana and out of subpoena range of the Court, the Court draws a negative inference in support of its findings against Martin regarding the training and qualifications of the men who loaded the *NAVIGATOR*.

27. At trial Martin claimed the decision about whether to wrap binder handles was made by the vessel's personnel and offered testimony from Joey Bouziga to support this contention. Webb directly contradicted this testimony and the Court, having observed both men, finds Webb's testimony to be the most credible. Webb testified that Martin's employees made the decision how to secure the cargo, not the vessel's employees, and that the decision about whether or not to wrap the handles would have been Martin's. The vessel's employees only role was to inspect after the securing operations were complete to make sure that the method chosen by Martin's employees was adequate. This testimony is supported by other evidence. First, Ensco's contract with Sonat specifically provided that vessel employees were not to be involved in the loading and securing of cargo. Donald Green, Martin's expert,

confirmed this was industry custom. Martin, on the other hand, had a contract with Sonat specifically to load and secure cargo. In that contract, Martin claimed it was the expert in the area and agreed to secure all cargo in a safe fashion. Joey Bouziga admitted Martin could be sued by the owner of the cargo if cargo was improperly secured and damaged in transit due to Martin's failure to properly secure the cargo. The Court finds that Martin either made or should have made the decision about how to secure the five pieces of oilfield casing involved in this incident, and expressly finds that Martin's contention that the vessel's crew made these decisions and Martin employees only followed orders is not credible.

28. The Court finds that Martin had the primary duty to load and secure the cargo in a safe fashion on the *NAVI-GATOR*, and it breached that duty. The Court also finds that Ensco's employees had a responsibility regarding this cargo, albeit a secondary one. Their job was to inspect the cargo once it had been loaded and secured to make sure it was safe for transport. The Court finds that Martin's negligent method of securing the casing was discoverable on inspection and should have been detected by Steve Spurlock, the Ensco employee who inspected after Martin had finished its operation. The Court finds Spurlock was negligent for failing to thoroughly inspect, detect, and have Martin correct the inadequate and improper means of securing the casing employed by Martin.

29. The Court finds that prior to leaving the dock Spurlock reported to Webb in general terms that the cargo was loaded and secured, but he did not report exactly how the cargo was secured, nor did Webb ever ask. Ordinarily the Court finds Webb would have acted properly in delegating to his mate the responsibility of ensuring that the cargo was properly loaded and secured and would not find him negligent for that delegation or relying on a general description of the loading and securing. In this case, however, Spurlock was a new mate aboard the *ENSCO NAV-IGATOR* and had previously served only on smaller vessels. The Court finds that Spurlock was qualified to serve as a mate. He had many years of experience in the Navy and had worked his way through the ranks at Ensco from able bodied seaman to mate to captain of smaller supply boats and then mate on the 180–foot supply boat. Webb testified, and the Court so finds, that smaller supply boats carry casing of this size with padeyes on it. Finally, the Court finds that Spurlock had a license to be a master on larger vessels than Webb. Nonetheless, given that it was his first hitch with Spurlock, the Court finds that Webb, in the exercise of ordinary care, should have personally inspected the securing work done by Martin while the vessel was still at dock to make sure Martin's employees had properly secured the cargo and that Spurlock had proper seamanship skills.

30. The Court does not find Webb to have been negligent for failing to inspect the vessel's cargo once the vessel put out to sea and it became clear that the cargo was not going to be immediately offloaded. Donald Green, Martin's liability expert, and Webb both testified that such cargo inspections should only take place in good weather. Being on the back deck of a vessel loaded with cargo in rolling seas is a dangerous place to be. The Court finds that after the unloading stopped on June 3rd, the seas were always rough, consistently 4 to 6 feet in height, with periodic 8 foot swells, and that the back deck where the cargo was stored was awash in water. Further, the Court finds there was no clear path to the area where this casing

was stored. Cargo was all over the back deck and Webb would have had to weave in and out of cargo in rolling seas on a wet deck to make his way to the very back to inspect the casing. The area between the headache rack on the vessel and the vessel's bullworks also contained both cargo and ship's equipment that did not allow for clear and easy passage to the back where the casing was loaded. Finally, the Court finds the location where the binders were positioned was not visible from the wheelhouse on the *NAVIGATOR*. In these circumstances, and given there was no indication that he needed to go back and inspect prior to June 4th, the Court finds Martin has failed to prove Webb was negligent in not inspecting the manner in which the casing was secured after the vessel left Fourchon.

31. Further, the Court finds that even if Webb should have conducted such an inspection, there is no evidence he could have done anything about the way in which the casing was secured. The Court finds Martin's employees were negligent in where they located the binders. Instead of locating them on the outside of the headache rack, Martin employees placed them between the last two pieces of casing on the starboard side. To wrap the binder handles would have required someone to insert his body or limbs into the space between two 15-ton pieces of casing while a vessel was rolling in 4 to 6 foot rough seas with occasional 8 foot waves. This would have been an incredibly stupid and unsafe action. Further, in this weather no one would have unhooked the chains securing this heavy casing and attempted to re-run them through the padeyes in the proper fashion and rebind them in the proper fashion. Thus, Martin has not proven that, even if Webb should have inspected the cargo once the vessel was underway, it was the legal cause of his injuries or damages.

32. Martin is also critical of Webb's decisions after the casing began rolling. It contends that Webb should have rousted other members of the crew to assist in placing the rope over the casing, or that he should have taken other steps, such as going back to port to have the cargo resecured, or simply heading his vessel into the seas in an effort to stop the cargo from rolling. The Court finds Martin failed to prove that Webb acted unreasonably when he attempted to place the rope over the pipe with the assistance of two other men. The Court finds the rolling casing was an emergency situation created by the failure of Martin's employees to properly secure the cargo. In this type of emergency situation, where the health and safety of the crew, vessel, and cargo are at stake, a captain is required to make on-the-spot decisions. Webb felt that he and the two other crew members could handle this rope, and there was no credible testimony that Webb breached any safety standard or engaged in unreasonable conduct by lifting the rope with the assistance of two other men. Further, the Court finds that Martin failed to prove that with the assistance of others, Webb would not have been injured.

33. Martin relies on the testimony of Stephen Chapman to support its claim that Webb should have returned to port once the rolling started or taken his vessel and headed directly in the seas. Webb testified that he did not attempt to take the vessel into port to have the cargo resecured because that would put him running side-sea and increase the vessel's roll. Webb also testified he did not take his vessel and head it directly into the seas because the seas were not running straight and the waves were not evenly timed. He felt either maneuver would actually increase the movement of the vessel and increase the potential for injury or damage

posed by the loose cargo. The Court finds that Webb's testimony on this matter is more credible than Chapman's, especially since Webb was there and there is no evidence that Chapman ever knew the specific details of the sea's movement when he gave his testimony. The Court finds that Martin failed to bear its burden and prove Webb was negligent for any of the decisions he made after the binder handles broke open and the casing began rolling.

34. In summary, the Court finds all the parties to this litigation to have been negligent. With respect to Ensco employees, the Court finds Ensco employee Spurlock negligent for failing to properly inspect and detect the incorrect method used by Martin to secure the pieces of casing and Webb negligent for failing to check on Spurlock's inspection before the vessel left the dock.

■ 35. This lawsuit is brought under the general maritime law. "Under the general maritime law, a party's negligence is actionable only if it is a 'legal cause' of the plaintiff's injuries." *Donaghey v. Ocean Drilling & Exploration, Co.,* 974 F.2d 646, 649 (5th Cir.1992). Legal cause under the general maritime law is something more than "but for" causation. *Id.* The Fifth Circuit defines the test for legal cause as requiring that the negligence must be a "substantial factor" in causing the injury. *Id.*

37. The Court finds that the negligence of the parties was both a legal cause and the proximate cause of the casing coming loose and the injuries and damages sustained by Webb. Webb testified that he had never seen cargo come loose when the binder handles were properly secured closed and the chain looped through, around, and back through each padeye. He testified this included cargo so secured in weather much worse than that encountered on June 3 and 4, 1998. The Court

found his testimony both very credible and supported by the warnings in the various handbooks introduced into evidence, which indicate that if binder handles are not positively secured closed, it is possible for them to come open and cargo to come loose.

37. The Court finds that the negligence of Martin was both a legal and proximate cause of Webb's injuries. The failure of Martin roustabouts to properly secure the binder handles shut and properly run the chains through the padeyes allowed the piece of casing to come loose on the back deck of the *ENSCO NAVIGATOR* and the failure of Martin to properly train and instruct its employees set the stage for all of this to transpire. The improper methods employed by Martin allowed the cargo to come loose, creating an emergency situation and leading to Webb being injured while trying to regain control of the cargo.

38. The Court also finds that the negligence of Spurlock and Webb in failing to inspect and detect Martin's failure to bind the handles shut and properly run the chains through the padeyes on the casing was both a legal and proximate cause of Webb's injuries, for the reasons set out in the paragraph above.

39. Martin contends that its negligence could not be a legal cause of Webb's damages because the negligence of Ensco and its employees constitutes a superceding cause, completely absolving Martin of fault. An intervening act cannot constitute a superceding cause if:

(a) the actor at the time of his negligent conduct should have realized that a third-person might so act; or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third-person so acted; or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

*Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir.1992).

■ 40. The Court finds that the acts of the Ensco employees after the negligence of Martin does not constitute a superceding cause. The Court finds Martin employees should have recognized that crew members of a vessel might not detect Martin's negligence in securing cargo and that the crew members might have to act to resecure cargo at sea if Martin employees failed to properly secure it while the vessel was at dock. The Court also finds that a reasonable man would not regard the Ensco employees's failure to detect Martin's negligence nor the conduct of Webb and his crew in trying to resecure the casing as highly extraordinary. The Court finds that Webb's actions at sea on the 4th certainly were a normal consequence of the situation created by Martin's conduct. Indeed, the Court finds that it would have been highly extraordinary if a captain had not taken steps to try to resecure the cargo. Further, the Court has already found that the manner in which Webb attempted to resolve the dangerous condition created by the rolling casing was not negligent under the circumstances, and his conduct certainly did not constitute extraordinary negligence. In short, the Court finds that this is not a case of superceding cause.

41. Having found more than one party at fault, the Court must ascertain the percentages of negligence of the various parties that caused Webb's injuries. In assessing these percentages the Court is mindful of the basic findings. Martin was found to be negligent in the ways in which its employees were trained and did their job. The negligence of Ensco's employees is basically a failure to detect the negligent Martin's negligence. Martin had the contract to properly secure the cargo and held itself out as an expert in the area of loading and securing cargo. Being the party who actually did the chaining and securing, and the supposed experts, the Court finds Martin's fault to be greater than that of Ensco's employees.

42. The Court believes this conclusion is supported by long standing jurisprudence regarding the allocation of responsibility for properly stowing and securing cargo. The stevedore, in this case Martin, is considered the expert in cargo operations, hired by the non-expert ship owner to do the loading and securing work. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 168–74, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). "[T]he justifiable expectations of the vessel [are] that the stevedore would perform with reasonable confidence." *Id.* at 172, 101 S.Ct. 1614. Given these realities of maritime cargo operations, it is obvious that the entity in the best position to prevent injuries due to improperly secured cargo is the entity that actually does the loading and securing, in this case Martin Terminal, Inc. *See, Couch v. Cro–Marine Transport, Inc.*, 44 F.3d 319 (5th Cir.1995).

43. Viewing the record in its entirety and considering the testimony of the witnesses, the exhibits, the contracts, the reasonable expectations of the parties and all the surrounding circumstances, the Court finds that Martin's negligence was the legal cause of sixty-six and two-thirds percent (66⅔%) of Webb's injuries and damages, the negligence of Ensco and its employees, other than Webb, was the legal cause of twenty percent (20%) of Webb's damages, and the negligence of Webb was the legal cause of thirteen and one-third percent (13⅓%) of his damages.

Even had the Court found Webb at fault for his conduct after the *NAVIGATOR* left the dock at Fourchon, the Court would still have found Martin to be the two-thirds cause of Webb's injuries and damages. The only change would have been in the division of the remaining fault between Ensco and Webb.

44. The Court finds that as a result of the incident of June 4, 1998, Webb suffered injuries to both his neck and lower back. The Court finds the testimony of Webb's treating orthopaedic surgeon, Dr. Carl Beaudry, and treating neurosurgeon, Dr. Ian Angel, to be the most credible regarding his injuries and their cause. The Court finds that the lifting incident of June 4, 1998, caused Webb to sustain a herniated disc at C6–7 and broad disc protrusion at L4–5 and broad annular bulge at L5–1 in his lower back. The Court finds that the cervical disc required extensive conservative treatment and the surgery performed in May 2000. The Court finds that the discs in Webb's lower back, in combination, are causing chronic low back pain, but they present a non-surgical condition. Webb has tried a variety of treatments to alleviate this pain, the most successful having been epidural steroid injections. While Dr. Beaudry does not think Webb needs surgery for his low back, he did testify, and the Court so finds, that Webb will need long-term care and that he has significant physical limitations. The Court finds that as a result of the neck and back injuries caused by the incident of June 4, 1998, Webb is limited to lifting no more than 10 pounds and not engaging in a job that requires repetitive lifting, bending, climbing, stooping, or working in cramped quarters. While Webb can work an 8–hour day, he should work in a job that alternates sitting, standing, and walking. The Court finds that Webb is limited to what vocational rehabilitation specialists classify as a sedentary type job.

45. The Court specifically finds that the injuries sustained by Webb as a result of the incident of June 4, 1998 will prevent him from returning to his former employment and that he has suffered a loss of earning capacity in the past and will suffer a loss of earning capacity for the rest of his life.

46. At trial each party offered live testimony from a vocational rehabilitation specialist about Webb's post-injury earning capacity. While there was some disagreement between the specialists, William Joseph Kramberg and William Quintanilla, there was an area of commonality. Both felt, and the Court finds, that Webb has the ability to be retrained and to seek and obtain gainful employment in a new area. Both specialists felt, and the Court finds, that Webb would benefit from training at a junior college to obtain an associates degree in computer assisted drafting. The Court finds that Webb could succeed in such a program and finds it would take 2 ½ years for him to complete the program. To the extent that the experts suggested Webb's post-injury earning capacity might be either higher or lower, the Court rejects those contentions and finds them not to be credible. At the end of the retraining program, the Court finds Webb would be able to obtain employment in the area of computer assisted drafting. Mr. Kramberg testified that entry level jobs in computer assisted drafting begin in the $10 to $11 an hour range, with the median salary in Southeast Texas being $13.43 an hour. Mr. Quintanilla testified for the defendant that entry level jobs in computer assisted drafting began between $10 and $15 an hour. Given that the median salary is $13.43 an hour, entry level positions are more likely to pay in the $10 an hour range. The Court finds that Webb has a

post-injury earning capacity of $10 an hour starting in 2½ years, and that this earning capacity will increase in the future at a real rate as discussed below.

47. In an effort to quantify Webb's economic loss both parties offered testimony from qualified economists, Drs. Kenneth McCoin and James Yeager. The Court finds the testimony of Dr. McCoin to be the most credible and believable, based both upon the substance of his testimony, and his manner of testifying, demeanor and fairness, and adopts his economic model with one modification.

48. The initial economic's issue is Webb's pre-injury earning capacity. Dr. McCoin concluded, and the Court so finds, that Webb's pre-injury earning capacity was $52,444.00 a year. Dr. McCoin reached this number by annualizing Webb's earnings in 1998, the year of his injury and the year in which he had served full time as a captain of 180–foot supply vessels. Dr. Yeager used as his pre-injury earning capacity the figure $31,379.00. The Court does not find this figure to be credible because it averages together several years of earnings, most of which reflect years during which Webb was employed by Ensco in lesser capacities receiving lower wages. The Court finds the proper approach in evaluating Webb's pre-injury earning capacity is to use the actual wages he earned at his position at the time of the injury, not wages he earned at lower paying positions in previous years, positions from which he had been promoted.

49. Martin argues that it is inappropriate to use Webb's wages with Ensco as a measure of his pre-injury earning capacity because after his injury Webb was terminated by Ensco. The parties introduced evidence about the reason for Webb's discharge. The Court specifically rejects the testimony that Webb was laid off because he was a "whiner" and had no potential for advancement, finding this testimony not to be credible or believable, and instead finds Webb was laid off because he was the odd man out. In 1998, after Webb was injured, Ensco hired another captain to replace him. After this hire, still in 1998, Ensco encountered troubled economic waters and needed to reduce employees. As part of the layoffs Ensco decided to fire one captain—Webb. The Court finds that Ensco then decided not to tell Webb about its decision until he tried to return to work. Eventually, after a doctor released him to try to return to work, Webb called and learned his position had been filled and that he was terminated. Webb was simply a captain without a boat. The Court finds that had Webb not been injured, he would not have been discharged because Ensco would not have hired the replacement captain who took his place. No other captains of 180–foot supply boats or larger were laid-off then or have been since. Indeed, since 1998 Ensco has hired captains. Accordingly, the Court finds that Webb's earnings at Ensco accurately reflect his pre-injury wage earning capacity.

50. Even if Webb would have been fired regardless of his injury, Ensco is not the only company in the United States that operates supply boats. There are other potential employers and the Court heard no evidence indicating that Ensco's wages and fringe benefits were any different than those paid by any other company. Earning capacity reflects the ability to earn money, not the specific employer who will pay the wages. At the time of the injury, the Court finds Webb's earning capacity was $52,444.00.

51. Webb contends his pre-injury earning capacity should not be measured by what he earned as captain of a 180–foot supply boat, but rather the Court should

increase that earning capacity at some point in the future to reflect a potential promotion to captain of an anchor handling boat. The Court finds that while it is possible Webb would have received such a promotion in the future, the Plaintiff failed to prove by a preponderance of the evidence that he would have.

52. In calculating Webb's pre-injury earning capacity the Court must also consider the value of his fringe benefits. It was uncontroverted that Ensco provided its employees the fully panoply of benefits. Webb received health insurance for both himself and his family, dental insurance, life insurance, disability insurance, a 401(k) pension program, and periodic contributions under a profit sharing plan. Webb gave very credible testimony at trial about the exact replacement costs of some of these benefits based on his personal efforts to purchase policies that provided lesser benefits. The Court accepts that testimony and finds the value of the fringe benefits Webb would have received as a Captain exceeded $10,000 per year.

53. Both Drs. McCoin and Yeager, in their analyses, used different numbers than the actual replacement costs that Webb testified he would incur in order to purchase lesser benefits than he received from Ensco. Dr. McCoin assumed the annual value of fringe benefits would equal fifteen point four percent (15.4%) of Webb's wages, or approximately $8,000/year. Dr. Yeager, on the other hand, used the annual figure of $5,095. In this case, the Court finds that Dr. McCoin's estimate more accurately reflects Webb's loss of fringe benefits than Dr. Yeager's and the Court will use his numbers, although both understate Webb's actual loss.

54. The final difference between the economists regarding Webb's pre- and post-injury earning capacities concerned Webb's future real compensation growth rate. The Court finds Dr. McCoin's analysis to be more credible and his is the one adopted by the Court. Dr. McCoin, relying on studies of real wage growth since 1970, testified that the growth of real compensation was about one percent (1 %) per year and that he used this figure in projecting Webb's future wage increases, both for the pre-injury earning capacity and the post-injury earning capacity. Dr. Yeager, on the other hand, testified that while Webb would have a real increase in wages of approximately point five percent (0.5%) through 2006, for the following ten years he could expect real wage decreases at a rate of one point three percent (1.3%) and for the year after that a real wage decrease of two point eight percent (2.8%). The Court finds Dr. Yeager's testimony on this issue not to be credible. First, Dr. Yeager testified that he obtained these figures from a federal government report whose name he could not cite. Dr. Yeager admitted he did not know how the federal government gathered this data or whether it was reliable. He further admitted that the federal government had not reached these conclusions about real wage decreases, but these were opinions that he drew from the raw data allegedly accumulated by the federal government. Dr. Yeager admitted that he had not subjected his interpretation of raw data to the rigorous process of peer review and, to his knowledge, only one economist had. The Court shall not mention that economist's name, other than to say he has previously testified in my court and the Court did not find him to be credible. While I did not strike Dr. Yeager's testimony on these matters, as requested by Plaintiff, the Court does not find it credible and rejects it. The Court finds a real compensation growth rate of one percent (1%) should be used in evaluating Webb's future economic loss.

55. With respect to Webb's loss of future earning capacity, the Court has previously found that he could be expected to re-enter the work force in two and one-half years earning $10 an hour. The Court finds that wage would also be supplemented by fringe benefits equal to approximately fifteen percent (15%) of his salary and that he would experience annual future real compensation growth at the rate of 1 one percent (1%).

56. The Court finds Webb earned $14,035 prior to trial from the auction of items on e-Bay.

57. After reducing for taxes and work expenses, the Court finds that Webb has suffered a loss of earning capacity in the past of $105,861.00.

58. With respect to Webb's loss of future earning capacity, this loss needs to be reduced to present value. The economists disagreed about the appropriate discount rate. Dr. McCoin opined that the appropriate discount rate was one and one-half percent (1½%) and Dr. Yeager opined that the appropriate discount rate was three percent (3%). The Court finds Dr. McCoin's proposed rate to be too low and Dr. Yeager's proposed rate to be too high. The Court finds that an appropriate discount rate at the current time, in light of current economic circumstances, is two percent (2%).

59. Applying the discount rate to the findings the Court has made previously, and after reducing for taxes of all types and work expenses, the Court finds that Webb has sustained a future loss of earning capacity of $686,007.00.

60. In addition to Webb's loss of wage earning capacity, he has suffered a loss of ability to perform household services. Webb testified, the testimony of the doctors confirms, and the Court finds that he has significant physical limitations. These limitations prevent him from doing some of the types of work he used to do around his home. Webb testified that he had purchased an older home and prior to his injury he personally had remodeled various sections of the home. He also maintained the other portions of his home. Webb testified that, as a result of the injury, he had been unable to continue his remodeling process and has to hire paid help to perform normal household maintenance. The Court finds Webb's testimony on this issue to be very credible and finds that Webb has suffered a permanent loss of household services.

61. Dr. Yeager, in his calculations, did not include any figure for loss of household services. Dr. McCoin testified that he assumed Webb would suffer a twenty percent (20%) loss of household services. Dr. McCoin's estimate, a loss of approximately $600/years, is reasonable and the Court adopts it. The Court finds that Webb has suffered a past loss of household services of $1,288.00 and will suffer a future loss of household services of $20,182.00.

62. The Court finds that Webb will need future medical care. Dr. Ian Angel testified that Webb will need $1,000 each year in the future for medical care for his neck. The Court finds this testimony to be credible and adopts it. Dr. Carl Beaudry testified that Webb will need future medical care for his back, including epidural steroid injections and medications. The Court so finds. Dr. Beaudry opined that looking at the cost of medical care incurred by Webb for the care and treatment of his back in the year preceding the deposition would provide the best possible estimate of the costs Webb would incur for the care of his lower back for the rest of his life. The cost of the epidural steroid injections over the year prior to the deposition was $5,085.00 and the medication costs were $2,435.81. The Court finds this

reflects the current annual costs of the medical care Webb will need in the future for his low back as a result of the injury of June 4, 1998.

63. The Court finds that Webb will incur $8,500 per year in present dollars for future medical care for the rest of his life as a result of the injuries of June 4, 1998.

64. Dr. McCoin testified that the present day value for each $1,000 per year of future medical care Webb would need for the rest of his life is $29,087.10, making the same relevant economic assumptions as were made with respect to Webb's future economic loss. The Court finds this testimony to be very credible. Multiplying $29,087.10 by 8.5 to reflect Webb's annual future medical care needs of $8,500.00 per year, the Court finds that Webb will need $247,241.12 for future medical expenses.

65. In addition to his economic loss and future medical expenses, Webb is entitled to recover damages for physical pain and mental anguish. This Court finds that Webb was a credible witness and that he has suffered significant physical pain and mental anguish. With respect to his physical pain, objective tests whose results cannot be faked demonstrate that Webb had a herniated disc pressing on a nerve in his neck causing pain to radiate down his arms and into his hands. Webb also testified about severe headaches as a result of the pain he had from his neck. While the radiating pain was relieved by Dr. Angel's surgery, Webb still experiences pain in his neck. That pain remains at a tolerable level as long as he limits his activities, but activities such as driving long distances or playing with his child cause increased pain. Dr. Angel further testified, and the Court finds, that Webb will develop arthritis in his neck as a result of this injury. Webb also has chronic, significant low back pain. The Court finds Webb's testimony was especially credible, given that he also testi-

fied his back pain was made tolerable by epidural steroid injections, whose effect lasts approximately three months. Webb testified that with the injections he could live with the pain as long as he did not engage in activities that were too strenuous. The Court finds all this testimony regarding Webb's physical pain to be credible. The Court finds that Webb will have these problems for the rest of his life.

66. The Court also finds that Webb has suffered significant mental anguish as a result of the injury of June 4, 1998. He has already undergone one surgery for his neck and will continue to need a series of epidural steroid injections to treat his low back problems for the rest of his life. Further, and most importantly with respect to Webb, as a result of his injury he has lost the ability to engage in his chosen profession. He is a man who obviously loved his work. He has been out of work and will have to go through retraining and reestablishing himself in the workforce. The record is replete with substantial evidence about the anguish Webb has suffered and the court finds Webb will suffer significant mental anguish the rest of his life.

67. For the physical pain and mental anguish that Webb has endured in the past, the Court finds that an award of $75,000.00 is fair and reasonable. For Webb's future physical pain and mental anguish, the Court finds that an award of $75,000.00 is fair and reasonable.

68. In order to obtain an associate's degree and a new job in a new field, both vocational rehabilitation specialists agreed Webb would need retaining. Mr. Kramberg estimated that the cost of such retraining, including tuition, books, and commuting expenses, would be approximately $11,000. Mr. Quintanilla offered no opinion on the cost of such retraining. The

Court finds that Webb will need $11,000 in order to obtain vocational retraining.

69. The Court finds that Webb has suffered past damages of $182,149.

70. The Court finds that Webb's future damages are $1,039,434.

71. Under maritime law Webb is only entitled to recover damages equal to Martin's percentage fault. *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). Having found Martin sixty-six and two-thirds percent (66⅔%) at fault, the Court finds that Webb is entitled to recover from Martin $121.432.67 for his past damages and $692,956.00 for his future damages.

72. The parties stipulated that Ensco paid $74,853.42 in maintenance and cure benefits to or on behalf of Webb. The Court finds that Ensco is entitled to recover a percentage of these damages equal to Martin's fault. The Court finds that Ensco is entitled to recover damages of $49,902.28 from Martin.

73. The awarding of prejudgment interest in maritime cases "is the rule rather than the exception and, in practice, well-nigh automatic." *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir.1986). A trial court only has discretion to deny prejudgment interest where there are peculiar circumstances that would make such an award inequitable. *Id.* In this circuit prejudgment interest is usually awarded from the date of loss to ensure the injured plaintiff is compensated for the use of funds to which he was entitled. *Id.* This Court finds there are no peculiar circumstances that would make an award of prejudgment interest from June 4, 1998, to the date of this judgment inequitable.

74. In setting the rate of prejudgment interest, a trial court may look to reasonable guide posts, including the interest rates set forth in 28 U.S.C. § 1961 for judgments. *Id.* at 1029. The Court finds the most equitable rate of prejudgment interest would be _____ percent.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1333(1). Webb was a seaman injured on navigable waters due to the manner in which cargo was secured on a vessel, a traditional maritime activity. Further, Ensco's claim for reimbursement of maintenance and cure is uniquely a maritime claim. Venue was uncontested. The parties all agreed to trial to the Court and proceeded under Federal Rule of Civil Procedure 9(h).

2. The injuries sustained by Webb, as described in the Court's findings of fact, were legally caused by the negligence of Defendant Martin Terminal, Inc., Ensco Marine Co., and both their employees. The Court finds that sixty-six and two-thirds percent (66⅔%) of Plaintiff's injuries and damages were legally and proximately caused by the negligence of Defendant Martin Terminal, Inc. and its employees; twenty percent (20%) of Plaintiff's injuries and damages were legally and proximately caused by the negligence of Ensco Marine Co. and its employee Steve Spurlock; and thirteen and one-third percent (13⅓%) of Webb's injuries were legally and proximately caused by his own negligence.

3. Martin contends that, as a matter of law, its negligence could not be a legal cause of Webb's injuries. The basis of this contention is that it was not the casing itself or any of the equipment used by Martin employees that actually caused Webb's injuries. Instead, Webb's injuries were caused when he attempted to lift a rope owned by Ensco in an effort to crib the loose piece of casing. This Court rejects this argument.

4. The facts in *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir.1992) are generally identical to those in the case at bar. The plaintiff was injured by equipment that belonged to his employer when that equipment was being used to correct a defective condition created by a defendant. The district court in *Donaghey* granted the defendant's motion for summary judgment, finding that any negligence by the defendant was not the legal cause of plaintiff's injuries. *Id.* The Fifth Circuit reversed, holding that the record indicated that the events that lead to the plaintiff's injuries were placed in motion only after the defendant's negligence caused a problem that required correction. *Id.* at 651. In this case, Webb was injured only after Martin's negligence in securing cargo allowed a piece of casing to come loose and put the Ensco crew in a position of having to do something to attempt to resecure it.

5. To the extent Martin's claim of no causation as a matter of law is based on the passage of time between when it improperly secured the cargo and Webb's injuries, *Donaghey* also disposes of the argument. Although no specific time was mentioned in *Donaghey*, it is obvious from the Fifth Circuit's opinion that the negligence of the defendant in *Donaghey* occurred a long time before the plaintiff's injury. It is not the time from negligent act to injury that is important, but rather once the defendant's negligence manifested itself, did that negligence place "into motion" the "elements that led to" the plaintiff's injuries. *Id.* In this case Webb was injured trying to correct a dangerous condition and emergency situation that manifested itself the morning of June 4th. The dangerous condition was never brought under control prior to Webb's injuries, but instead he was injured while trying to get that condition stabilized. In such circumstances Martin's conduct is considered the legal cause of Webb's injuries. *Exxon Co. ., USA v. Sofec, Inc.*, 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996); *Sanford Bros. Boats, Inc. v. Vidrine*, 412 F.2d 958 (5th Cir.1969).

6. The Court finds that Webb has suffered past damages of $182,149.00 and future damages of $1,039,434.00. Defendant Martin Terminal, Inc. is only liable for its percentage of fault. *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). Accordingly, Plaintiff Ernest Webb is entitled to judgment against Martin Terminal, Inc. for past damages in the amount of $121,432.67 and future damages in the amount of $692,956.00, for a total of $814,388 .67.

7. Ensco paid $74,853.42 in maintenance and cure benefits to or on behalf of Ernest Webb. Defendant Martin is liable to Ensco for sixty-six and two-thirds percent (66⅔%) of these damages. Ensco Marine Company is entitled to judgment against Martin Terminal, Inc. in the amount of $49,902.28.

8. Ernest Webb and Ensco Marine Company are both entitled to prejudgment interest on their past losses at the rate of 6 percent per annum, running from June 4, 1998, through the day prior to the entry of this judgment, and to post-judgment interest on the entire judgment, including the prejudgment interest, until said judgment is satisfied, at the rate of 6.032 percent per annum, starting from the date of entry of judgment.

9. All costs of court are assessed against Martin Terminal, Inc.

10. To the extent any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such. To the extent any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.